# ALLEN v. WILDMAN.

No. 5053.   Opinion Filed July 29, 1913.

Rehearing Denied September 2, 1913.

(134 Pac. 1102.)

1.   **APPEAL AND ERROR—Harmless Error.** The court in every stage of action must disregard any error or defect in the pleadings which does not affect the substantial rights of the adverse party, and no judgment shall be reversed or affected by reason of such error or defect. Section 4791, Rev. Laws 1910.

   (a)   No judgment shall be set aside or new trial granted by any appellate court of this state in any case, on the ground of misdirection of the jury or the improper admission or rejection of evidence, or as to error in any matter of pleading or procedure, unless it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right.

2.   **TRIAL—Appeal and Error—Presentation for Review—Findings of Fact—Necessity.** Upon the trial of a question of fact by the district court it is its duty, upon request, to find the material facts established by the evidence, so that exceptions may be taken to its views of the law involved in the trial. Error in this respect will not be presumed, but must be affirmatively shown. Section 5017, Rev. Laws 1910.

3.   **APPEAL AND ERROR—Presentation Below—Request for Additional Findings.** If, upon the trial of a question of fact by the district court, material facts have been proved, but not found, the court should be requested, before any motion for new trial, to modify the findings made to include the additional facts, or make further findings covering such facts, and only in the event of a refusal of the court to make the corrections, or to supply the omission, does ground for a new trial exist.

4.   **SAME—Presumptions—Harmless Error.** If, upon the trial of a question of fact by the district court, findings of fact are made, and such findings are not assailed in said court as incomplete and incomprehensive, it will be presumed by this court that they embrace all the facts of the controversy established by the proof.

5.   **ELECTIONS—Officers—Contest—Fraud—Effect.** Fraud does not invalidate the legal votes cast, but, by destroying the presumption of the correctness of the returns, as a rule it makes it necessary for any person who claims any benefit from the

votes to prove them, and, where no proof is offered, and the frauds are of such a character that the correct votes cannot be determined, the return of the precinct will be rejected.

6. **SAME—Contest—Burden of Proof.** As a rule, when the returns from a precinct are rejected on account of irregularities or fraud, the **prima facie** case made by the returns is thus destroyed, and the burden of proof shifts to the party claiming by virtue of the returns, and it devolves upon him to establish **aliunde** that, notwithstanding the illegal voting proved, a sufficient number of legal ballots were. cast for him to insure his success.

7. **SAME—Fraudulent Returns—Determination of Vote.** The returns may be rejected as fraudulent, and yet the true vote may be ascertained, and, where it can be ascertained, whether from the returns or from the evidence **aliunde,** the vote of the precinct is to be rejected.

8. **SAME—Judgment—Evidence.** Where there is no evidence tending to show fraud on the part of the election officers, and the only allegation goes to illegal votes of certain precincts, although a certain number of illegal votes are found to have been cast, in the findings by the trial court, the finding not disclosing for whom they were cast, yet taking the votes as admitted to have been received by the contestant and the contestee in certain precincts, and the votes as shown to have been received in the contested precincts by both the contestant and the contestee, and deducting all the illegal votes found to have been cast from the admitted votes of the contestant, and giving him the remainder of those cast for him, the contestant thus being shown to have received a total majority of 33 votes over the contestee, **held,** that it was not error for the trial court to render judgment in favor of the contestant.

(Syllabus by the Court.)

*Error from District Court, Blaine County;*
*J. R. Tolbert, Judge.*

Action by Jacob Wildman against S. M. Allen. Judgment for plaintiff, and defendant brings error. Affirmed.

*L. H. Hampton,* for plaintiff in error.
*Wm. O. Woolman,* for defendant in error.

WILLIAMS, J. This proceeding in error is prosecuted to review the action of the trial court wherein the defendant in error, as plaintiff, contested the title of the plaintiff

in error, as defendant, to the office of county commissioner for the First commissoners' district of Blaine county.

The parties will be herein referred to in the order and style in which they appeared in the trial court.

Issues having been joined, the cause was tried to the court without a jury. Findings of fact and conclusions of law were made as follows:

"(1) Plaintiff and defendant are and were citizens and electors of commissioners' district No. 1, Blaine county, Okla., on November 5, 1912.

"(2) Plaintiff was the nominee of the Republican party, and the defendant was the nominee of the Democratic party, and Martin J. Sanders was the nominee of the Socialist party, for county commissioner from the First district of Blaine county, before the general election held November 5, 1912.

"(3) That subsequent to the primary election, and within ten days thereof, the plaintiff duly filed with the county election board his statement of expenses and affidavit thereto in words and figures as follows:

"'Affidavit. State of Oklahoma, County of Blaine, I, Jacob Wildman, who was a candidate for the nomination, as the Republican party candidate for commissioner 1st dist. in the primary election, held on August 2nd, A. D. 1912, do hereby swear, that the itemized statement hereto attached contains each and every item of money or other thing of value, which I paid or expended or which I promised to pay, or expend, exclusive of treats, presents, favors, or other things which cost money or for which I have obligated myself to pay for the purpose of raising, or advancing my candidacy, directly or indirectly, it includes all such money, or other thing of value, which were paid by me through other persons, and no person had been authorized to expend money for me, or to pay out or expend anything of value as above enumerated, whose itemized report is not here attached. I know of absolutely no expenditures within the contemplation, spirit or meaning of this act, which were made for the purpose of directly or indirectly influencing or aiding, or advancing my interests as a candidate, which are not included either in this report or that of those accompanying it, and I believe no

such expenditures have been made, except as herein reported. This the 19th day of Aug., 1912.

"'[Seal.] J. WILDMAN.

"'Subscribed and sworn to before me this 9th day of August, A. D. 1912.

"'This report must be subscribed and sworn to by a candidate before some one authorized to administer an oath.

| | |
|---|---:|
| Watonga Republican | $ 5 00 |
| Geary Bulletin | 5 00 |
| | |
| Total | $10 00 |

"'Filed Aug. 15, 1912.

"'Blaine County Election Board,

By ————.'"

"(4) That pursuant thereto he was adjudged by the county election board of Blaine county to be the regular nominee of the Republican party for said office of county commissioner, and as such his name was printed on the general county ballots prepared by said county election board for the use in the general election on November 5, 1912.

"(5) Blaine county is divided into 31 voting precincts, of which the following are in commissioners' district No. 1, to wit, 9, 10, 11, 12, 15, 18, 19, 21, 25, 26, 27, 28, and 30.

"(6) Plaintiff contends that the election in the various voting precincts on November 5, 1912, was legal and regular, and duly held, and that, as a candidate for county commissioner in said district No. 1, he received 467 votes, the defendant 424 votes, and the Socialist candidate 190 votes for the office of county commissioner of the First district.

"(7) Plaintiff admits that said election was regularly and duly held in said various voting precincts in said commissioners' district except in voting precincts Nos. 12 and 30, and the election in these two voting precincts, the defendant claims and charges, was null and void, and by reason thereof, not counting the votes therein, he received a majority of the legal votes cast in said commissioners' district.

"(8) Defendant was the regular nominee of the Democratic party for the office of county commissioner for said district No. 1, and as such his name was printed on the ballots for the general election.

"(9) That the election inspectors in voting precincts 12 and 30, prior to the election, received through the mail Exhibits 8 and 9, which are as follows:

"Exhibit 8.

" 'Department of Justice Office of the United States Attorney Western District of Oklahoma.
" 'Guthrie, Okla., Oct. 31, 1912.

" 'Mr. Fred A. Wagoner, Deputy County Attorney, Chandler, Oklahoma—Dear Sir: I have your letter asking whether at the coming general election the precinct election officers can enforce the law commonly termed the Grandfather Law, and escape punishment therefor in the federal courts on a showing of good faith in enforcing said law. I presume your question has arisen on account of the apparent conflict between the decision of the Supreme Court of the State of Oklahoma and the United States District Courts for the Eastern and Western Districts of Oklahoma on the constitutionality of the law; the state Supreme Court having held the law constitutional, while the two United States Courts in the state have held it unconstitutional and void.

" 'It must be borne in mind that this all involves purely state matters as well as federal matters, and, in considering the same, these two phases of the law must be kept in mind. As to the purely state questions involved in the law, I do not express any opinion, the same not being within the jurisdiction of this office, and this opinion is directed solely to the federal question involved, that is, the application of the Grandfather Law to negroes who, on account of race, color, and previous condition of servitude, are not permitted to vote without submitting to certain tests of reading and writing. Nor shall I argue that question of the constitutionality of the law, for the reason that, after very extensive argument by some of the best legal talent of the state, it has already been in positive terms declared unconstitutional by the two United States District Courts in this state, which decisions are now the law of this state, as far as the federal questions therein involved are concerned, having never been reversed or modified.

"Knowing this, that the federal courts, having jurisdiction over the entire state, have declared the law to be unconstitutional and of no force and effect, the question arises whether the precinct election officers can enforce it against

negroes on account of their race and color, and then, when prosecuted in a federal court for doing so, defend the prosecution on a plea of good faith in enforcing the law. The question of good faith must be determined with reference to the decision of the courts on the subject and having jurisdiction thereof, so there can be no good faith in acting in direct conflict with the known decisions of the courts, although in the absence of any decisions such defense might be made. In the case against Beall and Quinn, who were convicted in the federal court at Enid, in 1911, for violating section 19 of the Federal Criminal Code in enforcing the Grandfather Law at the general election in November, 1910, the defense of good faith was attempted, although without success, as the verdict of the jury disclosed. However, in that case at the time the acts were committed which caused a prosecution, that is, in November, 1910, no federal court had passed upon the law.

" 'Furthermore, all precinct election officers are *quasi* judicial officers in a *quasi* judicial capacity, and, being officers of inferior and resticted jurisdiction, are all bound by the decisions of the federal courts declaring the law unconstitutional when applying the same to negroes desiring to vote for members of Congress and electors for President, and the defense of good faith will not protect them from prosecution for enforcing the law in direct conflict with the federal decisions.        " 'Respectfully,
                " 'HOMER N. BOARDMAN.
                    " 'United States Attorney.'
            "EXHIBIT 9.
" 'Talk It Over with Your Wife, Mr. Election Official, And
    Remember That You Will Go to the Penitentiary

    " 'If you violate the Federal Election Laws, and not Governor Cruce, nor his brother, Attorney A. C. Cruce. You will remember that the latter defended Beall and Quinn, who last year were convicted in the United States Court at Enid and sentenced to the penitentiary for violating the Federal Election Law, and the state paid the attorneys in these cases about $14,000.00 for defending these two men. This averages about $7,000.00 per case. It is not likely that the people of this state, already overburdened with taxes, will be willing to continue to pay out $7,000.00 every time an election official violates the federal statutes. The people are not suffi-

ciently anxious to enrich the Governor's brother, Attorney A. C. Cruce. Besides, what's the use? Where conviction is sure, there is nothing gained by paying out big sums of money for attorney fees. That is to say, there is nothing gained by any one but the attorney.'

"(10) The evidence failed to connect the plaintiff in any way with the printing and mailing of said exhibits, and the court is unable to determine from the evidence who caused the said exhibits to be printed and. mailed to the said election officers.

"(11) That after the primary election the various county candidates on the Republican ticket met and organized a campaign committee, and met with the chairman of the Republican campaign central committee of Blaine county, and elected E. H. Lookabaugh as campaign manager, and Norman Pearson secretary, and J. B. Scott treasurer, and assessed against each nominee of the Republican party in Blaine county, including the plaintiff, five per cent. of one year's salary of the office for which they are candidates to be used for campaign expenses.

"(12) That pursuant to said assessment the plaintiff paid to said campaign committee the sum of $25.

"(13) That subsequent to the November election said campaign committee filed with the county election board an itemized statement and affidavit in relation to the expenses of said campaign and the expenditure of money therein, in words and figures as follows:

Statement.

| | |
|---|---:|
| E. H. Lookabaugh, stamps, etc. | $  9.00 |
| Watonga Republican, printing | 12.00 |
| Watonga Republican, printing | 15.00 |
| Okeene Eagle, printing | 4.50 |
| First Natl. Bank, office rent | 10.00 |
| B. L. Cooper, rent desk | 2.00 |
| Wilder & Frohn, rent furniture | 2.00 |
| E. N. Pearson, stamps, letter heads, etc. | 8.00 |
| W. F. Shultz, livery | 4.75 |
| W. F. Hooper, cigars | 2.00 |
| W. M. Hale, livery | 4.80 |
| W. F. Hooper, cigars | 2.00 |
| R. L. Hysell, hauling voters to polls | 15.00 |
| W. J. Thompson, speeches and posting bills, etc. | 20.00 |
| J. W. Runsworn, polling twp., posting bills, etc. | 12.00 |

## Opinion of the Court.

| | |
|---|---|
| Chet Hallenbach, auto livery for voters | 10.00 |
| Geary Bulletin, printing bills | 3.75 |
| Mrs. Taylor, stenographic work | 1.50 |
| Star Barn, livery, posting bills | 2.00 |
| Watonga Auto Co., livery, hauling speakers | 4.50 |
| R. D. Fry, incidental expenses, speaking | 5.00 |
| J. W. Thompson, posting bills and speaking | 20.00 |
| Geo. Nicholson, posting bills and speaking | 20.00 |
| R. D. Fry, incidental expenses | 3.40 |
| L. W. Wilhite, houling voters | 15.00 |
| John Parish, getting voters to polls | 6.00 |
| J. C. Demmit, hauling voters to polls | 20.00 |
| E. H. Lookabaugh, stamps and cigars | 7.50 |
| T. C. Hammersley, hauling voters, etc. | 15.00 |
| W. F. Hooper, cigars | 4.00 |
| F. C. Waters, hauling voters | 5.00 |
| D. S. Schuber, auto livery, hauling voters | 15.00 |
| J. E. Gifford, painting signs | 1.50 |
| Troy Stansbury, hauling voters to polls, etc. | 10.00 |
| H. C. Lookabaugh, hauling voters to polls | 10.00 |
| John Russworn, work and hauling voters to polls | 15.00 |
| Frank Cronister, auto livery | 10.00 |
| E. D. Law, livery for voters | 5.00 |
| O. F. Appleman, livery for voters | 5.00 |
| W. E. Brown, livery for voters | 5.00 |
| N. Chaney, livery for voters | 6.00 |
| Watonga Auto. Co., hauling speakers | 11.80 |
| E. N. Pearson, stamps and stationery | 7.50 |
| John Newborn, polling twp. and expense of hauling | 20.00 |
| Watonga Republican, printing | 17.68 |
| Geary Bulletin, printing | 1.75 |
| Geary Bulletin, printing | 1.75 |
| D. A. Drake, printing | 4.50 |
| J. W. Thompson, work and hauling voters, posting | 23.00 |
| Geo. Nicholson, work and hauling voters, posting | 19.00 |
| Jeff Nanesa, work, etc. | 5.00 |
| J. H. Johnson, work, etc. | 5.00 |
| O. O. Dewese, auto livery to polls | 10.00 |
| W. F. Shultz, hauling speakers | 6.00 |
| W. R. Fields, work, etc. | 5.00 |
| J. A. Rouse, work, and hauling voters | 8.00 |
| B. C. Eilkinson, work, etc. | 3.00 |
| A. D. Drake, auto livery | 10.00 |
| E. H. Lookabaugh, draying furniture | 1.00 |
| Robert Newton, work at polls | 3.50 |
| H. C. Chapman, printing | 5.25 |
| Kennith Cronkhite, auto hire | 9.40 |
| Canton Record, printing | 3.50 |
| F. C. Hinkley, work election day | 6.50 |
| Watonga Republican, Morgan bills | 2.35 |

| | |
|---|---:|
| W. F. Hooper, cigars | 6.00 |
| Watonga Telephone Co., phone bill | 33.80 |
| Watonga Auto Co., hauling speakers | 5.00 |
| Dennis Haskins, work hauling voters | 6.00 |
| Frank Chronister, auto hire | 20.00 |
| Total | $610.08 |

### Receipts of Campaign Committee.

| | |
|---|---:|
| Peter Long, Candidate | $ 83.50 |
| Louis Vogt, Candidate | 45.00 |
| A. L. Bloss, Candidate | 92.50 |
| Harrison Brown, Candidate | 50.00 |
| Geo. Fenguson, Candidate | 92.50 |
| Daisy Pratt, Candidate | 60.00 |
| J. H. Lary, Candidate | 10.04 |
| M. F. Nigh, Candidate | 5.00 |
| Lee Akin, Candidate | 60.00 |
| W. F. Shultz, Candidate | 82.50 |
| E. J. Warner, Candidate | 18.00 |
| Geo. Jamison, Candidate | 25.00 |
| Jacob Wildman, Candidate | 25.00 |
| J. K. Fretz, Candidate | 25.00 |
| John Kennedy, Candidate | 25.00 |
| John Parish, money returned | 4.00 |
| D. A. Drake, money returned | 10.00 |
| Total received | $712.00 |

"(14) The court finds there is no evidence showing how the money shown by said statement to have been paid to W. J. Thompson, J. W. Thompson, and Robert Newton was disbursed, except as shown by that statement; but in this connection the court finds, as a matter of fact, that W. J. Thompson and J. W. Thompson were employed by said campaign committee to make speeches and do work outside of their local voting precincts, and that they are colored men, and that they did make speeches and do work for the Republican ticket outside their voting precincts, 12 and 30.

"(15) The court finds that George Nicholson, referred to in said statement as having received $39, is a negro voter of Logan precinct No. 12, and was the Republican committeeman from that precinct, and appropriated the money to his own use for work he did in the campaign for the Republican party in Blaine county; said work consisting of making a poll of his voting precinct, posting bills, and arranging for public speaking in his voting precinct, and attending the meetings of the campaign committee of this county.

"(16) The court finds that H. C. Lookabaugh, referred to in said statement as having received $10 from said campaign committee, is a white man, and furnished a team during the election on November 5, 1912, to haul voters to the polls in voting precinct No. 30, as a part of said consideration; but the evidence fails to show that his said conveyance was used to haul voters of any particular party or favorable to any candidate to the exclusion of others.

"(17) W. J. Thompson, J. W. Thompson, George Nicholson, and Robert Newton, referred to in said statement, are negroes and voters in precinct No. 12.

"(18) In voting precinct No. 12 there were seventeen votes cast by negroes, and of these thirteen can read and write the English language, and four cannot and could not.

"(19) The court finds that the negroes offering to vote, except in two cases, were interrogated as to their ability to read and write the English language, and upon an affirmative answer were permitted to vote without a test, except in about six cases, wherein the test was applied as to their ability to read, and four of these were denied the right to vote.

"(20) The court finds that one negro voter, Charley Hurt, cannot read or write, and that he was permitted to vote, and was assisted by the election officers to vote to the extent of actually stamping the ballot for him; but the court further finds in this connection that the officers did not influence the manner of his voting, but simply showed him how to vote and actually stamped the ballots as the voter indicated he desired.

"(21) Another negro voter who could not read or write was permitted to vote, and was instructed by the election officers how to stamp the ballot; but the voter handled the stamp himself.

"(22) One white man who was not a regular voter under the laws of this state by reason of not having been in the state for a period of twelve months prior to the election was permitted to vote for the state ticket.

"(23) One negro voter who could not read or write the English language was furnished a ballot, and permitted to vote for state officers, and not permitted to vote for the county ticket.

"(24) The returns from the various voting precincts in the commissioners' district involved in this action were made out by the local election officers in duplicate, and sealed in separate envelopes, one copy inclosed in the ballot boxes and returned to the county election board and one copy returned to the county election board by the inspector in person.

"(25) The county election board duly met in session and remained in session November 6th and 7th for the purpose of tabulating the returns from the various voting precincts.

"(26) That from the returns thus made from the voting precincts in this commissioners' district the tabulation showed that the plaintiff herein had received 467 votes, and the defendant 424 votes, and the Socialist candidate 190 votes.

"(27) Pursuant to such returns and tabulation a certificate of election was made out by the secretary of the election board to the plaintiff, and on November 7th was signed by Tom Mosely, secretary of the election board, and by W. C. Broady, another member, but was never delivered to the plaintiff.

"(28) That subsequent thereto, and on or about November 11th, the chairman of the county election board and the secretary thereof met in their office in the courthouse at Watonga, and, after considering the returns and tabulation further, threw out eleven voting precincts of the county, which included precincts Nos. 9, 10, 12, 28, 30, after which they tabulated the remaining voting precincts in this commissioners' district No. 1 and the aggregate showed that the defendant received a plurality of 26 votes, and pursuant thereto the said two members of the county election board issued and delivered to the defendant a certificate of election as commissioner from district No. 1 aforesaid.

"(29) The other member of the county election board, Mr. W. C. Broady, had no notice or knowledge of the action of the chairman and secretary of the county election board in subsequently tabulating the returns and throwing out the election precincts aforesaid, until after the same had been done, and the certificate of election had been issued as herein stated.

"(30) That on January 6, 1913, the defendant filed a bond and took the oath of office as county commissioner of Blaine county, district No. 1, and assumed the duties of the

office, and was recognized by the other county commissioners of Blaine county as such, and is now and has been ever since performing the duties of said commissioner.

"(31) Plaintiff herein was duly elected county commissioner from district No. 1 in 1910, and duly qualified as such and was a candidate on Nov. 5, 1912, to succeed himself; and on Jan. 6, 1913, he made the bond required by law as a county commissioner of said commissioners' district No. 1, which was approved by the proper authorities, took the oath of office, and presented himself in the room of the county commissioners in the courthouse at Watonga, Blaine county, Okla., about 8 o'clock on the morning of January 6th, as aforesaid, and assumed the duties of the office of county commissioner, and acted as such in allowing a few bills, together with the other old members of the board of county commissioners. Thereafter the defendant appeared in commissioners' room with his counsel and demanded possession of the office of county commissioner from district No. 1, and that he be permitted to perform the duties of such office, and after considerable discussion pro and con, both parties being represented by counsel, and the plaintiff and the defendant each attempting to serve and offering to do so, and claiming the office of county commissioner from district No. 1, but upon the advice of county attorney of Blaine county and that of his own counsel the plaintiff withdrew from the controversy and from the place where the board of county commissioners was meeting, and stated to them that he would contest the matter in court, and on January 7, 1913, he filed this action.

"(32) In voting precinct No. 30 the court finds that 25 votes were cast by negroes.

"(33) Of these 25 voters, the court finds that five of them could not read and write the English language; that six were tested, and, after testing them as to their ability to read and write the English language, four were refused the privilege of voting, and two were permitted to vote; that there were three on the outside who could not read and write, and who, by reason of the action of the election officials did not vote or offer to vote.

"(34) At this voting precinct the court finds that the inspector, upon asking those negroes if they could read and write, and upon receiving from them an affirmative answer, permitted them to vote without further test.

"(35) The court finds that there was a controversy over the legal right of one Hugh Wadley to vote, said Wadley being a negro; but the election officials decided that he was legally entitled to vote, and permitted him to do so. However, the court finds as a matter of fact that he was not a legal voter at the time.

"(36) The court finds that in this box there were several voters hauled to the polls; but just who hauled them, or whether the hauling was limited to any particular party or to voters favorable to any particular candidate the evidence does not show.

"(37)' In regard to Exhibits 8 and 9, the court finds that in this box the effect of these circulars (above referred to as Exhibits 8 and 9) was to make the election board cautious and to rather intimidate them; but the inspector stated that they did not cause him to swerve from his official duty in enforcing the law in regard to the qualifications of voters, and the court cannot say that they had that effect.

"(38) In regard to the effect that the circular Exhibit 8, and the circular marked Exhibit 9, had upon the election officials in voting precinct No. 12, the court is unable to find as a fact the result of the distribution of said circulars, but states that J. A. Dunn, the inspector for that voting precinct, testified that, having received these, he was deterred from strenuously enforcing the law in regard to the test to be applied to negro voters for the purpose of determining their ability to read and write the English language, or any section of the Constitution, and especially as to national matters, as he was in awe of the federal courts, and, when a negro presented himself with the statement that he was able to read and write, he ordinarily permitted him to vote. * * *"

"CONCLUSION OF LAW.

"The court is of the opinion that the plaintiff is entitled to recover, and it is so ordered, and counsel will prepare a formal journal entry, accordingly to which defendant excepts. * * *"

Defendant moved the court to render judgment in his favor upon the findings of fact for the reason that (1) said findings were not sufficient to entitle plaintiff to recover, and (2) did not justify a judgment in favor of the plaintiff

against the defendant on the issues as framed. The grounds set out in the motion for a new trial are those named in the statute, except the additional assignment "that said findings of fact and conclusion of law are not sufficiently comprehensive, and do not cover and determine all the material issues made and involved by the pleadings herein."

Section 4791 of Rev. Laws 1910 provides:

"The court, in every stage of action, must disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect."

Section 6005, Rev. Laws 1910, also provides:

"No judgment shall be set . aside or new trial granted by any appellate court of this state in any case, civil or criminal, on the ground of misdirection of the jury or the improper admission or rejection of evidence, or as to error in any matter of pleading or proceedure, unless in the opinion of the court to which application is made, after an examination of · the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."

The only limitation upon the appellate court is that such is reversible error, if it constitutes a substantial violation of a constitutional or statutory right; otherwise not. The question does not rise here in case, as where the jury was improperly instructed as to the law, or where incompetent evidence was admitted or competent evidence rejected, as to whether such error would constitute such a substantial violation.

Section 19, article 2 (section 27, Williams' Ann. Const. Okla.) of the Constitution of this state provides that "the right of trial by jury shall be and remain inviolate."

Arizona, California, and Oregon have substantially the same provisions as are contained in sections 4791 and 6005, supra, incorporated in their respective Constitutions. Obviously in such cases no such limitation exists upon the appellate jurisdiction, even in cases involving the right of trial by jury.

See *Albert Steinfield & Co. v. Wingwong* (Ariz.) 128 Pac. 357; *Ariz. E. R. Co. v. Globe Hardware Co.* (Ariz.) 129 Pac. 1104; *Erickson v. State* (Ariz.) 127 Pac. 754.

But the error alleged in this case merely goes to the question as to whether the special findings of fact as made by the trial court were sufficiently specific and definite under the issues as framed. The defendant, in making his objection as to the findings of the court, nowhere makes request for additional findings as to specific matters, and such is necessary before the question can be successfully assigned for our consideration on review in this court. By proper pleading it should be specifically pointed out to the trial court wherein his findings were not sufficient, and requests made for such additional specific findings, before such question will be considered on review in this court. *Brown et al. v. First National Bank of Temple*, 35 Okla. 726, 130 Pac. 140; *Shuler v. Lashhorn*, 67 Kan. 694, 74 Pac. 264.

The defendant insists that the following questions were put in issue under the pleadings: (1) Was plaintiff eligible to the office? (2) Did he receive in precincts 12 and 30, or either of them, such a majority as, when added to the total votes in the other precincts, would give him a majority in the district?

1. As to defendant's contention that the findings of fact were not sufficient, the trial court found: "Plaintiff and defendant are and were citizens and electors of commissioners' district No. 1, Blaine County, Okla., on November 5, 1912." This was the date on which the election was held.

An elector is "one who elects or has the right of choice; specific, a person entitled to vote in favor of a candidate for office." Webster's New International Dict. This brings the definition squarely within the terms of a qualified elector, under section 4a, article 3 (section 346, Williams' Ann. Const. Okla.) of the Constitution of this state.

Where the finding on the particular issue relates to the ultimate fact, which may embrace the question of law, as the

party was a citizen or an elector or that the party was the owner of certain personalty, and no specific objection is made to such finding in the trial court, without a request for additional findings as to specific facts before motion for new trial, such findings on review in this court will be deemed sufficient and not reviewed. *Jantzen v. Emanuel German Baptist Church,* 27 Okla. 473, 112 Pac. 1127, Ann. Cas. 1912C, 659; *German American Ins. Co. v. Paul,* 2 Ind. T. 625, 53 S. W. 442.

A right to appeal is provided by law in order that errors prejudicial to the rights of the losing party in the trial court may be corrected; not that a new trial may be awarded on purely technical grounds, involving errors that do not injuriously affect the substantial rights of the complaining party. The appellate courts, in reviewing the action of trial courts, should, however it is practicable, require the alleged errors to be pointed out, so that the trial court may have a fair opportunity to correct all errors and thereby obviate reversals and needless delays.

2. "Every person offering, giving or loaning to another any money, or other thing of value to induce him to influence any elector to vote in a particular way, or for any person at any such election, shall be punished by a fine not exceeding five hundred dollars, or be imprisoned in the county jail not exceeding one year, or by both such fine and imprisonment." (Section 2078, Comp. Laws 1909.)

"Any person guilty of either of the offenses mentioned in * * * section (2078) of this article shall thereafter be forever disfranchised and rendered ineligible to any office of trust or profit within this state." (Section 2110, Comp. Laws 1909.)

"Every person who, with intent to promote the election, either of himself or of any other person, or candidate, either: (1) Furnishes, or engages to pay or deliver any money or property, for the purpose of procuring the attendance of voters at the polls, or for the purpose of compensating any person for procuring attendance of voters at the polls, except for the conveyance of voters who are sick, poor or infirm; or,

(2) furnishes, or engages to pay or deliver any money or property, for any purpose intended to promote the election of any candidate, except for the expenses of holding and conducting public meetings for the discussion of public questions, and of printing and circulating ballots, handbills and other papers, previous to such election, is guilty of a misdemeanor." (Section 2082, Comp. Laws 1909 [Rev. Laws 1910, sec. 2111.])

"Any person guilty of offering, giving or accepting a bribe, a reward, a benefit, or advantage, or anything of value, present or future, directly or indirectly, intended to influence the vote of the person to whom it is given or offered, shall be deemed guilty of a felony. * * *" (Section 3216, Comp. Laws 1909 [Rev. Laws 1910, sec. 3134].)

"* * * That I have not paid, or contributed, either directly or indirectly, any money or other valuable thing, to procure my nomination or election * * * except for necessary and proper expenses expressly authorized by law." (Sections 1 and 2, art. 15 [sections 315 and 316, Williams' Ann. Const. Okla.] of the Constitution.)

The trial court concluded, as a matter of law, under the facts found by him, that the plaintiff was not rendered ineligible. The contributing of a reasonable sum or an assessment by a candidate to a campaign committee nowhere appears to be prohibited by statute. The presumption is that the campaign committee will observe the law and expend such money only in a lawful way. The statute expressly authorizes the plaintiff or the campaign committee to furnish or engage, to pay or deliver, money or property for the purposes of conveying voters who are poor, sick, or infirm to the polls, and also the expenses of holding public meetings for the purpose of discussing questions previous to the election. Any sum contributed by him to said committee would be presumed, unless there was something appearing to the contrary, to have been contributed for such lawful purposes. If the plaintiff had contributed this money under such circumstances as it might be reasonably inferred that he had knowledge that it would be used for the violation of these statutes, a dif-

ferent conclusion might follow; but no such finding of fact has been made. The forfeiture of the right to hold office and the imposition of penalties upon freemen will not operate by judicial construction unless the legislative act under the facts proved to that effect reasonably leads to such conclusions.

3. Was the plaintiff elected under the facts found? The burden in the trial court was upon the plaintiff. *Rampendahl v. Crump,* 24 Okla. 873, 105 Pac. 201. Under the face of the returns, as found by the court, plaintiff was elected. Under the court's findings, was the *prima facie* case, established by these returns, destroyed to such extent as it was rendered incumbent to purge the boxes in order to prevail against the certificate of election held by the defendant. It is admitted in the pleadings that the vote, as tabulated and shown by the records, is correct except as to precincts 12 and 30. Under said admissions, the plaintiff received in the uncontested precincts 362 votes to the defendant's 346. In precinct 12 plaintiff received 90 votes, and defendant 50, according to the face of the returns. The court found as to said precinct that 17 votes were cast by negroes, 13 of whom could read and write, and four could not. The finding neither discloses as to whether they or their ancestors had lived under an organized form of government prior to January 1, 1866, and were entitled to vote thereunder, nor as to whether they or either or them on Jauary 1, 1866, resided in a foreign country, and have since then become naturalized citizens of the United States, or were the descendants of such persons. But charge these four votes to the plaintiff as invalid. The court also found that one white man voted who was not a legal voter. Charge this, also, to the plaintiff. That makes only five illegal votes in said precinct, which, being charged to the plaintiff, reduces his majority in said precinct to 35. In precinct 30 plaintiff received 31 and the defendant 12, according to the face of the returns. The court found that 25 of these votes were cast by negroes, and of said number five could not read

and write. No finding was made as to whether they or their ancestors, prior to January 1, 1866, lived under any organized form of government, and were entitled to vote, nor as to whether they or either of them on January 1, 1866, resided in a foreign country, and since then have become naturalized citizens of the United States, or were descendants of such persons. But consider them as illegal, and charge these five votes to plaintiff. That would reduce his majority to 14 in said precinct. Then add the majority of the plaintiff in said precincts 12 and 30 together, to wit, 35 and 14. That makes 49 majority. Deduct from the 49 majority 16 votes, the majority on the returns in favor of the defendant as to the other precincts. Then the plaintiff was elected by 33 votes. This calculation is based on the theory that all the illegal votes were cast for the plaintiff, and on the assumption that the verity of the returns from precincts 12 and 30 was destroyed. See *Rampendahl v. Crump, supra; Incorporated Town of Ryan v. Incorporated Town of Waurika,* 29 Okla. 655, 119 Pac. 220.

It is not contended that the election officers acted corruptly or dishonestly, but merely through intimidation illegal votes were received. This intimidation under the finding of facts was not traced to plaintiff or his agents.

The judgment of the lower court is affirmed.

HAYES, C. J., and KANE and TURNER, JJ., concur; DUNN, J., absent and not participating.