## CITY OF TECUMSEH v. CITY OF SHAWNEE et al.

No. 22001. Opinion Filed March 17, 1931.

Rehearing Denied April 7, 1931.

Maxey, Holden & Holleman and J. B. Dudley, for plaintiff.

Reily & Reily, Goode, Dierker & Goode, Waldrep & Winterringer, Iris C. Saunders, A. B. Shuttee, and J. Knox Byrum, for defendants.

ANDREWS, J. A special election was held in Pottawatomie county, Okla., pursuant

to the provisions of sections 6, 7, and 8, art. 17, of the Constitution of Oklahoma, and sections 5704 to 5726, C. O. S. 1921, on the question of changing the county seat of Pottawatomie county as therein authorized. The contesting cities were Shawnee and Tecumseh. At the conclusion thereof the Governor of the state of Oklahoma issued a proclamation declaring Shawnee to be the county seat of Pottawatomie county, and this action was filed in this court by the city of Tecumseh for the purpose of determining the questions presented by it with regard to the legality of the election.

The testimony of the plaintiff's witnesses shows that a fund was raised to be used in the county seat campaign in the aggregate sum of $14,464. That fund was deposited in three banks temporarily and transferred by check to the Shawnee National Bank, on which bank all checks for disbursement for expenses of the campaign were drawn. Those checks aggregated $14,032.26. The checks are in evidence. When analyzed they disclose the following:

Twenty-nine checks were issued, aggregating $325.50. for polling; eight checks, aggregating $407.35, for postage; thirteen checks, aggregating $186.00, for stenographic help; twenty-one checks, aggregating $2,792.31, for pamphlets, circulars, newspaper advertising, and billboard advertising; sixteen checks, aggregating $349.05, for registration of voters; two checks, aggregating $117.25, for preparation of precinct maps; twelve checks, aggregating $306.93, for miscellaneous expense, including office rent, $75, pictures, $86, and other small items; five checks, aggregating $221.50, for labor; fifteen checks, aggregating $586.37, the purpose for which they were issued being undisclosed; four checks, aggregating $290, for automobile expense; and checks to members of the campaign committee, classified as follows: Two checks to Geo. N. Kerfoot, aggregating $450, one of which was a refund of $250, and the purpose of the other not disclosed by the check; one check to C. C. Hawk in the sum of $200; four checks to T. C. Waldrep aggregating $1,400; five checks to O. P. Ellis aggregating $1,250, and seventeen checks to J. A. Ingram aggregating $5,150.

Ingram's personal record shows that he received $6,150, and he testified that he paid $1,000 of it to Waldrep for an attorney's fee due to Waldrep in some litigation over the construction of a county jail. The method of handling that $1,000 accounts for the discrepancy. The bank account shows that In-

gram received only $5,150, the other $1,000 having been paid by check to Waldrep.

Ingram's personal record shows disbursements to the amount of $6,139.85, included in which is the $1,000 paid to Waldrep and which has been heretofore accounted for. If Ingram is charged with $6,150, he is entitled to a credit for $6,139.85. If he is charged with only $5,150, then he should be credited with only $5,139.85. His disbursements show five payments to Waldrep aggregating $805, one payment to Ellis in the amount of $200, five payments to Hawk aggregating $425, one payment for advertising in the amount of $50, one payment for court costs in the amount of $35, three payments for postage aggregating $28, and 16 payments for office expense aggregating $108.75. The total of those payments is $1,651.75, leaving a balance of $3,488.10, which was paid out in 169 items to various persons. The account does not show the purpose of those payments, but Mr. Ingram testified, on behalf of the plaintiff, that the money was paid out to the individuals whose names appeared on his record for their services and expenses in working for the interest of Shawnee in the campaign, to attend farm sales and other public meetings, to distribute literature, to make arguments in favor of the removal of the county seat to Shawnee, to haul voters to the polls, and, so far as they were able, to influence the voters to vote for the removal of the county seat to Shawnee. There is nothing in the record to the contrary.

The record discloses no instance where any member of the campaign committee representing Shawnee employed or paid anyone to work for Shawnee, except where the person stated that he or she was for Shawnee in the campaign. The record shows one instance of an attorney repaying a client a part of an attorney's fee, but there is nothing in the record to show that that attorney was in any way connected with the campaign committee.

The $450 received by Kerfoot by check is accounted for by the rebate to him of $250 and the delivery by him of $200 to Hawk.

Mr. Hawk received $200 by check. $125 in cash from Ingram, and $200 in cash from Kerfoot. He testified that he spent $580.50 arranging for cars to be used on election day and that he employed men and women to work for Shawnee. He made a record of the names of the individuals paid by him and at the close of the campaign delivered that record to the campaign committee. Those that he employed were directed by him as follows:

"A. Well, go into a community and work for the interest of the campaign which we had on, and if necessary hire a man with his car, and hire a man to go out and investigate the individuals and see whether they were for Shawnee or Tecumseh. Q. And you mean you electioneered with individuals to try to get them to vote for your candidate? A. Yes, sir."

Mr. Waldrep testified that he expended 'around $700 or $800" for the expense of redistricting the county; that the secretary of the county election board was removed from office by the Secretary of the State Election Board and took with him all of the records of his office, thereby making it necessary that the county be redistricted; that the county did not have the funds with which to pay for the work and that the work was paid for out of the campaign fund. He kept a record of his expenditures.

The nature of the campaign was disclosed by the testimony of Mr. Ellis, who expended approximately $1,250. From that testimony we quote as follows:

"Q. Now, for what did you expend this $1,250, Mr. Ellis? A. Well, to be frank with the proposition, this started along about August 1, I believe, if I remember correctly, when we started the petitions. We had a card system that we had the different towns in the county polled. I think I have one of the blank cards with me. For instance, that card right there (indicating). A lot of preliminary work had to be done in the beginning, in which I was one of the instigators, and I carried those cards, had them printed, and we had the town of Maud and the town of Shawnee and the different parts of the county polled to see whether people were registered or not. That was in the beginning, where the petitions were formulated, and we were anxious, after we had more than a sufficient number to call the election, to bring over the Governor. We had a lot of stenographic work in getting those petitions copied. Those cards were taken to poll the county and the different towns. Q. To see how the precincts stood? A. Yes, sir; and to see whether they were registered or not, as to that card right there. That started about August. Q. That started along in August sometime? A. Yes, sir. Q. That started before you got any of this money here we are talking about? A. Yes, sir. Q. Now, this $1,250 that you got, did you use any of that to employ persons to work for you in the campaign; campaign for you; electioneer for you? A. Well, the first beginning of that, some of it was applied—a lot of people didn't feel like volunteering their services. We had to have the different places polled to see whether they were registered—formulation of that card right there. Q. Now, these parties that were taking the poll, Mr. Ellis,

what were their instructions in regard to electioneering for you? A. Simply to find if the people were registered, and, in addition to that, as the card states there, if they were for or against Shawnee; and to use their influence in some instances where they were for Shawnee. Not a penny of this went out, though, to hire any one that didn't volunteer to state they were for Shawnee in the beginning. Q. All the parties, then, you hired, as I understand you, stated to you before you employed them that they were for Shawnee? A. Absolutely. Q. You didn't employ anybody else? A. Not a one."

We have set out this statement of the record as to the finances for two purposes, one of which is to show the amount of the disbursements and the duplications in the figures as to the expenditures and the other to show the record of the expenditures. We deem this to be necessary in view of the fact that the plaintiff alleged:

"That said committee, nor any other person, or persons, kept no complete or correct books or record of the collection and disbursement of said fund, but that it was intentionally handled by the disbursers thereof in such a manner that to whom it was expended and for what purpose expended cannot be ascertained from any record; and that said fund was used indiscriminately for the purpose of bribing and corrupting voters throughout the county to vote for Shawnee and in buying whisky for the purpose of inducing voters to vote for Shawnee; and that more than 1,000 voters were bribed and corrupted, either by the payment to them of money or the furnishing to them of whisky, to vote for Shawnee, who otherwise would have voted for the plaintiff herein, and that so many voters were bribed and corrupted by the indiscriminate use of said fund that it is impossible to ascertain the true result and the will of the incorrupted voters of the county from the result of said election; and that said election is therefore void and of no force and effect, and should be so declared by this court."

The witnesses for the plaintiff testified to a positive state of facts to show that this election was conducted about as fairly as any election could be held in which a campaign was made to secure a correct poll of the voters, the registration of as many as possible, and to see that as many as possible voted at the election. While workers were employed not only to ascertain the feeling of the voters but to set forth the merits of the contentions made by Shawnee and the reasons advanced by its supporters for moving the county seat from Tecumseh to Shawnee, those who expended the money for the campaign committee testified that before they made a deal with any one to work for

Shawnee they relied upon the statement that the worker was already for Shawnee and was working and helping Shawnee. Not only did the witnesses for the plaintiff testify to a positive state of facts, as before stated, but those who were interrogated in regard thereto testified that they saw nothing wrong with the conduct of the election. There is nothing in this record to support the quoted allegations of the plaintiff's petition.

The plaintiff is in the position where it is the county seat and will continue to be until it is removed in accordance with the constitutional provisions for removal. If the election is not valid, the county seat remains where it is, and the plaintiff wins. It appears to this court that the actions of the plaintiff in this case must be considered in determining the good faith of its contentions made herein. Certainly the plaintiff may not, in good faith contend that the expenditure of money for taking a poll of the voters, for the distribution of literature, for the printing of newspaper advertising, and for the furnishing of automobiles for transportation of voters, is illegal and that the election should be invalidated by reason thereof, when the record shows that the plaintiff did those identical things. The record shows that the plaintiff, through its agents, paid out money for similar purposes. One of the leaders on their committee testified:

"Q. Now, you also looked after the question of paying for having your district down there polled, didn't you? A. Yes, sir. Q. You were on the campaign committee? A. Yes, sir."

From the direct examination of Mr. Ingram by one of the attorneys for the plaintiff we quote the following:

"Q. Well, on election day, Joe, you had automobiles around there at nearly every precinct, you and Tecumseh both? A. Yes, sir. Q. Isn't that right? A. Yes, sir. Q. And those automobiles were hauling voters to the polls? A. Yes, sir."

The record shows that the Tecumseh committee published newspaper articles and distributed circulars.

While the defendant made no effort to show the expenditure of money by the plaintiff, the facts above stated appear in the record as evidence of the fact that the plaintiff expended money for those purposes.

The disbursement of the fund is similar to that shown in the opinion of this court in the case of Allen v. Wildman, 38 Okla. 652, 134 Pac. 1102, wherein items were stamps, printing, office rent, furniture rent, letterheads, livery, hauling voters to polls,

speeches, posting bills, polling townships, auto livery for voters, stenographic work, incidental expenses, speaking, getting voters to polls, painting signs, work, auto hire, work election day, and phone. It was there contended that the contribution of a candidate for office to such a fund disqualified the candidate from holding the office he sought. This court said:

"The contributing of a reasonable sum or an assessment by a candidate to a campaign committee nowhere appears to be prohibited by statute. The presumption is that the campaign committee will observe the law and expend such money only in a lawful way. The statute expressly authorizes the plaintiff or the campaign committee to furnish or engage, to pay or deliver, money or property for the purposes of conveying voters who are poor, sick, or infirm to the polls, and also the expenses of holding public meetings for the purpose of discussing public questions previous to the election. Any sum contributed by him to said committee would be presumed, unless there was something appearing to the contrary, to have been contributed for such lawful purposes."

One of the attorneys for the plaintiff said, "I will admit Mr. Ingram is a good man." There is nothing in the record to indicate that either Mr. Ingram or any of the other members of the campaign committee representing Shawnee are not good men. The material witnesses in the case were brought here by the plaintiff; they were plaintiff's witnesses; plaintiff seeks to select from their testimony that which is favorable to it and either to disregard the remainder or to impeach it by insinuations that the witnesses testified falsely at the instigation of the agents of Shawnee. In an attempt to justify this position the plaintiff quotes from the case of Modern Woodmen of America v. Michelin, 101 Okla. 217, 225 Pac. 163, a statement as follows:

"A jury need not accept the testimony of a witness merely because there is no direct testimony contradicting it, where it contains such inherent improbabilities as satisfies them of its falsity."

We agree with that statement of the law. It applies in the sort of case in which it was approved, but it has no application to the facts here. Here the plaintiff put the witnesses upon the stand and thereby vouched for their integrity. It now selects from their testimony such portions as meet its approval, uses those portions and relies thereon to establish its case, and now asks this court to disregard the remainder of the testimony of those witnesses for the reason stated in the quotation. They want to take,

as correct, that portion of the testimony of their witnesses showing that some $14,000 was raised and expended, but they want to deny that portion of the testimony of their witnesses showing the purposes for which the money was expended. They want the testimony of their witnesses to stand in so far as it shows that men were employed to drive automobiles. but they want to deny that portion of the testimony of their witnesses showing that they were to transport only such voters as are authorized by law to be transported. We cannot permit plaintiff to select from the testimony of its witnesses that portion that it approves and to reject the remainder.

The Constitution of Oklahoma designates Tecumseh as the county seat of Pottawatomie county (section 8, art. 17) and provides that it shall remain the county seat until changed by a vote of the qualified electors of the county in the manner therein designated (section 6, art. 17). That section not only authorizes the changing of a county seat designated in the Constitution and the procedure therefor, but its context clearly discloses that the designation in the Constitution of a county seat was not intended to be permanent. It is subject to change by the qualified electors in the manner therein provided. In order to change a county seat at this time, the applicant therefor must receive two-thirds of all votes cast in the county at the election held therefor. In the instant case the defendant not only received two-thirds, but, according to the proclamation of the Governor, received 13,744 votes as against 6,739 votes for Tecumseh. In its pleadings the plaintiff alleged:

'That the announced results made by the various precinct officers as to the vote is incorrect, erroneous and untrue, and that, as a matter of fact, a true and correct count and tabulation of the ballots themselves in the various precincts of the county will disclose that the plaintiff received 6,940 votes, and that the defendant the city of Shawnee received 12,544 votes, which is less than the constitutional majority required under the Constitution and laws of the state to change the county seat from Tecumseh to Shawnee * * *''

—and prayed for a recount of the ballots. Knowing that if those allegations were true a recount would determine the litigation, and all parties agreeing that the ballots had been properly preserved, this court directed a recount of the ballots to be had and a recount was had in the presence of the attorneys for the plaintiff, with the result that the tabulation thereof showed Shawnee to have received 13,757 votes and Tecumseh 6,744 votes,

a gain for Shawnee of 13 votes and a gain for Tecumseh of 5 votes. The result of the recount was directly contrary to the allegations of the plaintiff's petition.

The constitutional procedure for changing county seats was complied with, as shown by this record, and by the vote of the qualified electors the county seat has been changed from Tecumseh to Shawnee, unless, as contended by the plaintiff, section 7, art. 17, supra, was violated to the extent that the election was void. That is the question submitted in the brief of the plaintiff. All of the other questions raised by the pleadings have been abandoned.

The plaintiff submits two contentions, the first of which is as follows:

"The expenditure of the enormous campaign fund, by the campaign committee of Shawnee, in furtherance of its candidacy, as shown by the evidence, constitutes bribery and fraud, and voids the election under the Constitution and laws of the state."

That contention is based on section 7, article 17, supra, which is as follows:

"Any person or corporation offering money or other thing of value, either directly or indirectly, for the purpose of influencing any voter for or against any competing town in such election, shall be deemed guilty of bribery."

And section 6214, C. O. S. 1921, which is as follows:

"Any person guilty of offering, giving, or accepting a bribe, a reward, a benefit, or advantage, or anything of value, present or future, directly or indirectly, intended to influence the vote of the person to whom it is given or offered, shall be deemed guilty of a felony and upon conviction shall be fined not less than $100 nor more than $1,000, and shall be confined in the state prison not less than one nor more than three years for each offense. Money or other thing of value, given or lent to be betted on the result of an election, or the promise thereof, or a bet with another that such other will vote a certain ticket or for a certain candidate, and the gift of such bet or the share therein, or the promise thereof, shall be deemed a bribe. Whoever shall receive money or other thing of value, to be so betted under such agreement, or whoever receives money or other thing of value, to be used for the purpose of procuring or influencing the vote of himself or another, shall be deemed to have been bribed."

Whether or not the campaign fund was "enormous" is a question of fact to be determined from the facts and circumstances in the case.

In considering those sections we are re-

minded of the language of Mr. Justice Holmes, in Bain Peanut Co. v. Pinson, decided February 24, 1931, by the Supreme Court of the United States, 51 S. Ct. 228, as follows:

"The interpretation of constitutional principles must not be too literal. We must remember that the machinery of government would not work if it were not allowed a little play in its joints."

The plaintiff cites the decisions of this court in City of Tecumseh v. City of Shawnee, 33 Okla. 494, 126 Pac. 440; Town of Grove v. Haskell, 24 Okla. 707, 104 Pac. 56; Incorporated Town of Ryan v. Town of Waurika, 29 Okla. 655, 119 Pac. 220; Incorporated Town of Bristow v. City of Sapulpa, 33 Okla. 484, 126 Pac. 446; 20 Corpus Juris 186; and four Canadian decisions. We do not consider it necessary to discuss the Canadian decisions or the text in Corpus Juris further than to say that that text deals with bribery, which is not shown by the record in this case, and the portion relied upon by the plaintiff is in conflict with the established rule in this state.

County seat cases have been before this court a number of times.

In Incorporated Town of Bristow v. City of Sapulpa, supra, it was held that disqualified votes should not be counted in determining the number of votes cast, but that corrupted and bribed votes or votes obtained by fraud should be counted in the number of votes cast. There is nothing in the case dealing with the question of what is bribery. We refer to it only for the reason that it is cited by the plaintiff.

In City of Pond Creek v. Haskell, 21 Okla. 711, 97 Pac. 338, in considering a county seat election, this court held that section 6, art. 17, of the Constitution was self-executing. In Town of Westville v. Town of Stilwell, 24 Okla. 892, 105 Pac. 664, it was again held that that constitutional provision was self-executing and that legislation with reference thereto must be considered only as supplemental thereto.

It was therein held that a majority of all votes cast was necessary and that where neither of the two competing towns received a majority of all votes cast, it became the duty of the Governor to call a second election. Under the conditions as they existed at that time, a majority of the votes was all that was necessary. Those cases are not otherwise in point here.

In the case of Town of Grove v. Haskell, supra, this court applied the harmless error doctrine to such elections and held that

where provisions with reference to notice were substantially complied with, and no showing was made that the electors did not have actual notice or knowledge of the election, the same would not be held void or set aside. The vital and essential question, as stated therein, is, Did the want of notice or knowledge result in depriving a sufficient number of the electors of the opportunity to exercise their franchise as to change the result of the election? If not, then the will of the electors, as expressed, should be sustained. It was further held that where the election board ignored some of the mandatory provisions as to the form of the ballots, and they were received by the electors, and in good faith cast by them, in the absence of fraud, the election would not be annulled. Therein this court held:

"Elections are the ultimate expression of the sovereign will. When fairly expressed—that is, free from taint of fraud or charge of improper conduct—it becomes the duty of courts to sustain them, where it can be done by a liberal construction of the laws relating thereto, rather than defeat them by requiring a rigid conformity to technical statutory directions, which do not affect the substantial rights of the electors. All reasonable presumptions as to their regularity will be indulged, and the penalty of disfranchisement will not be visited upon a qualified voter where he is not at fault, except in response to a plain mandatory requirement of the statute."

The question of bribery was an issue in that case, and with reference thereto this court held that votes obtained by bribery are illegal and void and should not be counted, but refused to hold the election void, in the absence of a showing that the bribery had the effect of changing the result of the election. The court said:

"The question now arises whether or not such a course of conduct will avoid the election or merely the votes influenced by the offers made. To our minds the latter result, and not the former, would follow."

Therein was under consideration section 7, article 17, supra. The effect of that decision is that that section of the Constitution is in conflict with the rule existing in many states in which it is held that offering to give courthouse sites, buildings, and other property to the county, in consideration of the citizens thereof voting to locate the county seat at the town making the offer, does not violate the bribery statutes of those states nor contravene their public policy. This court therein held that such offers constitute bribery within the meaning of section 7, art. 17, supra.

That decision lays down three rules with reference to county seat elections: First, that all reasonable presumptions are in favor of the regularity of the election; second, that a liberal construction should be given to the proceedings providing for the election; and third, that bribery affects only the votes cast and not the entire election.

Following that holding there can be no question but that the offering of a "free site for courthouse and jail" is within the provision of that section. With that in mind, the plaintiff alleged:

"That the defendant city of Shawnee and those who campaigned for it, through speeches, propaganda and otherwise advised the voters of the county that if the county seat was removed to Shawnee, Shawnee and the citizens thereof would furnish a free site for a county courthouse and jail, and that by this propaganda approximately 1,000 voters were influenced and induced to vote for Shawnee upon the promise and expectation that a free site for a courthouse and jail would be furnished and given to the county by the city of Shawnee and its citizens; that this act and conduct on the part of Shawnee and those supporting it constitute and is bribery under the law, and that a sufficient number of voters were induced to vote for Shawnee on account of this propaganda, who otherwise would have voted for Tecumseh to have changed the result of said election."

There is nothing in the record to support any portion of those allegations, and the evidence offered by the plaintiff in support thereof is entirely insufficient to warrant any such charge.

We are now asked to extend the meaning of section 7, art. 17, supra, and hold that the section is an inhibition not only against the sort of offer considered in Town of Grove v. Haskell, supra, but that it is an inhibition against the employment of persons to use their influence with the voters in behalf of one of the contestants in the county seat campaign. No such construction has ever been given to that section and we decline to enlarge upon the construction heretofore given it by this court.

In Town of Grove v. Haskell, 31 Okla. 77, 116 Pac. 805, a second appeal, the harmless error doctrine was again applied, and it was there held that:

"Irregularities shown to have occurred on the holding of an election which do not appear to have affected the final result, nor to have cast substantial doubt thereon, will be deemed immaterial"

—which rule we think should govern the application of section 7, article 17, supra.

In Town of Checotah v. Town of Eufaula, 31 Okla. 85, 119 Pac. 1014, the question presented was largely a question as to the procedure to be followed in holding elections. The harmless error doctrine was therein again applied. It was therein held that the ballots were not rendered invalid or void by reason of the defect in the execution of the required affidavits, inasmuch as the affidavits were in substantial compliance with the statute. The statute requires the statement to be signed and sworn to, and none of them were sworn to. It was claimed that because the electors did not hold up their hands and swear to the affidavits, or ask to be sworn, they were insufficient, but the court denied that contention.

In Incorporated town of Ryan v. Town of Waurika, supra, the rule was announced that:

"It is only where no proof is offered, and the frauds are of such a character that the correct vote cannot be determined, that the returns of the precinct will be rejected."

In that case Ryan received 1,500 votes and Waurika 1,736 votes, and it was therein contended that 686 votes cast at Waurika should not be counted.

The record in that case showed that one of the executive committee of the town of Waurika served as a judge of the election at the Waurika box; that he had been a participant in at least 20 county seat fights; that a fund of $13,000 had been raised by popular subscription to be expended by the committee; that all evidence concerning its expenditures was purposely destroyed, or no account kept; that neither the executive committee nor any witness on the stand could or would tell how any considerable portion of said sum was expended; that partisans of Waurika, just prior to the election, caused a large number of negroes to be detained in the town for the purpose of voting them, said committee furnishing them free board and amusement; that three different gangs of transient railroad laborers were brought from a distance and voted; that of the 115 men employed on a ditch in the town and voted it was impossible to tell how many of them voted legally, or how many were paid $2 by one of said committee, ostensibly for their day's work, but really for their vote; and that a party of the executive committee took a part of the campaign fund and visited other voting precincts in the county on election day and spent it in influencing votes for Waurika. That testimony, the court found, was ample to destroy the value of the re-

turns as evidence and to justify the setting of the same aside.

It will be noted that the facts disclosed by that record are materially different from the facts disclosed by the record before this court. Here the evidence shows that the campaign committee representing Shawnee did none of the things recited by this court as the basis of its decision in that case.

In City of Tecumseh v. City of Shawnee, supra, it was held that:

"An offer of the mayor and city council of a city, that is a candidate for designation as a permanent county seat at an election for that purpose, to lease to the county for courthouse and jail purposes for a period of ten years the city's city hall at a rental of $10 per year, when the rental value of said property is $3,000 per year, which is made to induce voters to vote for said city at the election, constitutes, by reason of section 7, art. 17, of the Constitution, bribery."

That is the first syllabus. There is nothing in this record to bring this cause within that rule. The other syllabus dealt with the effect upon the result of an election of that sort of bribery when taken in connection with other facts therein found to exist. It was therein held that where that sort of bribery existed and, in addition thereto, "* * * where the supporters of said city, by voluntary subscription, raised a fund of more than $20,000, no record of the expenditure of which was kept; and it was intentionally handled by the disbursers thereof in such a manner that to whom it was expended and for what purposes expended could not be ascertained from any record; and it could not be determined what part of it was spent legitimately and what part illegitimately; and it is shown that a large number of voters, to wit, 61 in number, in different parts of the county, were bribed with part of said money to vote for said city, and that some of the election officers participated in said fund; and it is impracticable, if not impossible, on account of the way in which said money was handled, to determine the extent of its corrupt influence upon the electorate of the county; and where, by reason of the foregoing fraud and corruption, the result of the election is inextricably in doubt, and the will of the uncorrupted voters of the county cannot be ascertained from the returns of the election, said returns should be held for naught, and the burden held to be upon said city claiming to have been selected at such election as the permanent county seat to show such fact by evidence aliunde the returns."

It will be noted that the record in this case does not show any of the facts found to exist by this court in that case. There was no offer for the benefit of the county, the campaign fund was materially less, a record of expenditures was kept so as to show to whom the funds were expended and for what purpose they were expended, there was no one bribed to vote for Shawnee, no election officials participated in the distribution of the fund, and it was not only possible but practicable to determine the full effect of the use of the fund.

The plaintiff bases its case upon certain language used in the body of the opinion, and not reflected in the syllabus, with reference to the majority in favor of Shawnee after purging the ballot of votes cast by unqualified persons, persons bribed by money and persons bribed by the offer of the city hall for courthouse purposes. The opinion is based upon the approval by the court of the finding of the referee that the offer of the city hall for courthouse purposes "did influence voters to vote for Shawnee, and that such influence was so extensive and general throughout the county that it is impracticable, if not impossible, to ascertain the extent thereof." The record in this case does not warrant any such finding. There is nothing in this case from which any such finding could properly be made.

In City of Blackwell v. City of Newkirk, 31 Okla. 304, 121 Pac. 260, the harmless error doctrine was again applied and it was held that defects in the procedure did not invalidate the election or the votes cast by the voters. With reference to the question of bribery the contention was therein made that whisky was furnished and used to influence the voters at the election. The court found that there was no evidence that whisky influenced the voters. The court said:

"While the whisky may have been furnished by the citizens of Newkirk with the ultimate purpose and design that it should be used by Cullison to influence voters at the election, still, if it was not used by him for that purpose, and had not the effect to influence and corrupt the voters in casting their ballots, the act of Cullison in having the whisky and dispensing it promiscuously among some voters after they had voted, and others who were not voters, at his place of business, about a block from the polls, although it be an unlawful act as to Cullison, should not result in disfranchising the entire vote cast at that precinct. Mere intent by the partisan of a candidate to unlawfully influence voters at an election cannot operate to render void the votes of electors who were not influenced and affected by such intent.

"To hold otherwise would permit a zealous partisan of a candidate, or an unscrupulous opponent, to defeat the will of the electors

of any precinct, or of an entire county, by offering a bribe before the election, or by bestowing favors upon some of the voters after they had cast their ballots, although the voters were entirely uninfluenced by the conduct of such persons.

"It is well settled that all votes obtained by paying, giving, or offering to pay or give, anything of value to electors therefor, are, upon proper proof, to be rejected by a court in a contest. Article 215, McCrary on Elections. But the votes of those who neither directly nor indirectly participated in the bribery or unlawful agreement, and who are not the recipients of any benefits of the unlawful conduct of him who attempts to influence corruptly any election, are not to be rejected. Berry v. Hull, 6 N. M. 643, 30 Pac. 936. If any of the voters in Beaver township were influenced by the conduct of Cullison in dispensing liquor in his place of business on that day, plaintiff should have directed its proof to showing who such voters were, and other facts tending to show that they were influenced by the conduct of Cullison. Upon such showing, it would be the duty of this court to reject such votes, but not to reject the entire box of that precinct. Town of Grove v. Haskell, 24 Okla. 707, 104 Pac. 56."

That case is directly in point with the issue presented here. Under that authority, even though the campaign committee of the city of Shawnee had furnished its workers with money to use for the purpose of bribing voters (something that the record does not show), under the rule announced in that decision that fact would not invalidate the election, but would invalidate only the votes influenced thereby.

With reference to election cases other than county seat cases, Mr. Justice McNeill, in Kimberlin v. Board of Com'rs of Garvin County, 78 Okla. 143, 189 Pac. 361, stated the rule to be as follows:

"When an elector is permitted to deposit his ballot, the presumption is in favor of the legality of the vote, and the burden is on the attacking party to show a lack of qualification in such elector.

"Where it is sought to review the validity of an election on the ground of illegal voting, those seeking to overcome the result, as declared by the election officers, have the burden of proving, not only that illegal votes were cast in sufficient number to change the result, but by whom and for whom, or for what issue or question submitted such votes were cast.

"The mere fact that an inconsiderable number of persons disqualified to vote at a bond election were permitted to participate therein, is not sufficient to avoid such election, where it is possible to ascertain the true vote, and the proposition carried by the requisite number of votes."

In Gilliland v. City of Clinton, 131 Okla. 186, 268 Pac. 254, Mr. Justice Hefner, speaking for the court, stated the rule to be as follows:

"In an action to set aside an election on the ground of illegal voting, the burden of proof is upon those seeking to set aside the election to show that sufficient illegal votes were cast to change the result of the election, and in the absence of such showing, the election will not be held invalid."

In Dunagan v. Town of Red Rock, 58 Ok'a. 218. 158 Pac. 1170, it was held that those seeking to overcome the result of an election on the ground of illegal voting had the burden of proving, not only that illegal votes were cast in sufficient number to change the result, but by whom and for whom, or for what issue or question submitted, such votes were cast. The same rule was announced in Goar v. Brown, 82 Okla. 227, 200 Pac. 156. and in Re Incorporation of Town of Big Cabin, 132 Okla. 200, 270 Pac. 75.

In Wadsworth v. Neher, 138 Okla. 4, 280 Pac. 263, Mr. Justice Cullison, speaking for the court, said:

"In an action to set aside an election on the ground of illegal voting, the burden of proof is upon those seeking to set aside the election to show that sufficient illegal votes were cast to change the result of the election, and, in the absence of such showing, the election will not be held invalid."

In King v. State ex rel. Lowe, 96 Okla. 297, 222 Pac. 960, this court, speaking through Mr. Justice Mason, said:

"The fact that disqualified voters are permitted to participate in an election in this state is not sufficient to void such election. where it is possible to ascertain the true vote. Kimberlin v. Board of Commissioners of Garvin County, 78 Okla. 143, 189 Pac. 361. It is not error, however, for the trial court to hold an election void where it is impossible to separate the valid from the invalid votes, and where the correct result is impossible of determination. Martin v. McGarr, 27 Okla. 653, 117 Pac. 323; Incorporated Town of Ryan v. Town of Waurika, 29 Okla. 655, 119 Pac. 220; Rampendahl v. Crump, 24 Okla. 873, 105 Pac. 201"

—and quoted with approval from Allen v Wildman, supra, as follows:

"The returns may be rejected as fraudulent. and yet the true vote may be ascertained, and, where it can be ascertained independently of the rejected returns, the law requires that it be respected and en-

forced. Where the true votes cannot be ascertained, whether from the returns or from the evidence aliunde, the vote of the precinct is to be rejected."

When those decisions are reconciled, we find that error in the conduct of county seat elections must materially affect the result thereof or it will defeat the result thereof. It is the duty of courts to sustain elections where it can be done by liberal construction of the laws relating thereto, rather than to defeat them by requiring a rigid conformity to technical directions which do not affect the substantial rights of the electors. All reasonable presumptions as to the regularity of elections will be indulged and the penalty of disfranchisement will not be visited upon a qualified voter where he is not at fault, unless the irregularities shown to have occurred are sufficient to cast a substantial doubt as to the result of the election. Mere intent by a partisan to unlawfully influence voters at an election cannot operate to render void the votes of the electors who were not influenced and affected by such intent. Bribery will void the votes influenced by the offers made, but it will not void the election, unless the influence thereof was so extensive and general throughout the county that it is impracticable, if not impossible, to ascertain the effect of the bribery.

The purpose of section 7, art. 17, supra, was to prevent the influencing of any voter for or against any competing town in such an election by the offer of money or other thing of value either directly or indirectly for the purpose of influencing the voter for or against any competing town, and the offering of a "free site for courthouse and jail" is an offer made for the purpose of indirectly influencing the voters of the county. Since such an offer is in general and in its nature may influence every voter, it is impracticable, if not impossible, to determine the effect thereof upon the result of the election. The section does not purport to, and does not, in fact, inhibit the employment of voters to work for one of the competing towns in the campaign and to try to influence the voters by argument or by the presentation of facts with reference to asserted reasons for the removal of the county seat. "Influencing," as used in section 7, art. 17, supra, does not include persuasion by argument or presentation of contentions or facts. The payment of money or the delivery of property either directly or indirectly to a voter in order to induce him to vote for or against a competing town is bribery under the terms of the section, but the payment of money or the delivery of property to a voter for his services, his time, and his expenses in presenting the merits of a competing town to a voter, thereby inducing the voter to vote for or against the town, is not within the provisions of the section.

Our conclusion with reference to the first contention was foreseen by the plaintiff and it submitted its second proposition, which is as follows:

"If the expenditure of the enormous campaign fund by the campaign committee of Shawnee does not constitute bribery and fraud voiding the election under the Constitution and laws of the state, nevertheless, the acts of such committee constitute an infraction of the criminal laws of the state which amounts to corruption and is against the public policy of the state which voids such election."

Section 1528, C. O. S. 1921, on which the plaintiff relies, is as follows:

"Any person, who, with intent to promote the election, either of himself or of any other person, or candidate, either:

"First. Furnishes, or engages to pay or deliver any money or property, for the purpose of procuring the attendance of voters at the polls, or for the purpose of compensating any person for procuring attendance of voters at the polls, except for the conveyance of voters who are sick, poor, or infirm; or,

"Second. Furnishes, or engages to pay or deliver any money or property, for any purpose intended to promote the election of any candidate, except for the expenses of holding and conducting public meetings for the discussion of public questions, and of printing and circulating ballots, handbills and other papers, previous to such election, is guilty of misdemeanor."

There is nothing in this record to show that any person authorized to act for the Shawnee campaign committee furnished, or agreed to pay or deliver, any money or property for the purpose of procuring the attendance of voters at the polls, or for the purpose of compensating any person for procuring attendance of voters at the polls, except for the conveyance of voters who were sick, poor, or infirm. Positive directions were given to all of the workers as to who should be hauled.

The contention of the plaintiff is that while money or property may be paid or delivered for the expense of holding and conducting public meetings for the discussion of public questions and of printing and circulating ballots, hand-bills, and other papers, previous to such election, the per-

138

son so employed must not, under any circumstances, while so doing, say anything or do anything otherwise to influence a voter in favor of the person who employed him. We can give this statute no such construction. We refuse to say that it is lawful to employ a man to make a speech to a hundred men, and unlawful to employ a man to make a speech to one man. We refuse to say it is lawful to employ one to discuss public questions in a public meeting, but that it is unlawful to employ one to discuss public questions with those with whom he comes in contact outside of a public meeting. We refuse to say that it is legitimate and proper to pay a man to prepare an argument and to pay to have it circulated, and that it is unlawful to pay that man to go from one voter to another and make the same argument verbally. We refuse to say that a campaign may be conducted through newspapers and by use of the printing press, but that it may not be conducted by word of mouth. To do so would be to violate the rule of construction announced by this court in Town of Grove v. Haskell, supra, on the second appeal, in which Mr. Justice Dunn, speaking for the court held:

"When the literal enforcement of a statute would result in great inconvenience, or lead to consequences which are absurd, and which the Legislature can not be held to have contemplated, the courts are bound to presume that such consequences were not intended, and to adopt a construction which shall promote the ends of justice, and avoid the absurdity."

So far as we have been able to find, the only time that section 1528, supra, has been before this court for construction was in Allen v. Wildman, supra, heretofore quoted from, in which this court did not give the section the construction sought by the plaintiff to have placed upon it.

The plaintiff relies upon sections 6119, 6121, and 6122, C. O. S. 1921, dealing with the amount of money that can be lawfully expended by certain candidates for office in a primary election and the effect thereof, and says that the fund expended in this campaign is out of all proportion to that provided for in a primary election and voids the election. We consider those sections to have no application. The Legislature of Oklahoma has never seen fit to provide a limitation upon expenditures in elections. The only limitation provided is as to primary elections. This is not a primary election.

In State ex rel. Ruth v. Walker, 122

Okla. 95, 251 Pac. 497, this court held that sections 6112, 6119, and 6121, C. O. S. 1921, "commonly referred to as the Corrupt Practices Act," do not prevent the taking of the oath of office and the performance of the duties and functions of the office, in the absence of a conviction in a criminal court for the offense. It was there held that those sections do not disqualify one to hold the office to which he is nominated until after a conviction of the offense and that that method is exclusive.

The plaintiff does not refer to section 6112, C. O. S. 1921, which deals with primary elections and which is a part of the same legislative enactment and which requires the filing of an itemized statement setting forth in detail "a full and complete record of his expenditures of money or other things of value, including promises to pay money, or other things of value, as well as all treats, presents, or favors which cost money, or other thing of value, either present or future, which expenditures, treats, promises, presents, or rewards were intended for the purpose of aiding or advancing in any way the opportunities of such candidate, or which would have or be likely to have that result." That section and the complementary sections were before this court in State ex rel. Gauntt v. Lasher, 116 Okla. 273, 244 Pac. 809, in which this court held that section 6106, C. O. S. 1921, and section 6113, C. O. S. 1921, must be construed together and that, when so construed, the provisions for issuing nomination certificates are directory, the issuance depending upon the filing by the candidate of the expense report required by law to be filed. The court further held that under the provisions of section 6121, supra, when construed with sections 6106 and 6113, Id., the county election board is not vested with authority or jurisdiction to refuse to print the name of a nominee upon the ballots for the general election, "unless and until such nominee be convicted of the offense therein defined." Those decisions announce the public policy of Oklahoma with reference to primary elections, and it is directly contrary to the contention of the plaintiff.

The plaintiff relies upon the case of State ex rel. v. Elting, 29 Kan. 397, in which Mr. Justice Brewer discusses the effect of a candidate giving an elector personally money or property. The word "personally" was used deliberately and nothing therein said has reference to the employment of people to present the merits of a cause or to their payment for so doing.

The plaintiff refers to the case of State ex rel. Smith v. Bowman, 170 S. W. 700, wherein the Court of Appeals of Missouri discusses the question of public policy of the state of Missouri.

Public policy is determined by the Constitution and not by legislative body, where legislation is in conflict with the provisions of the Constitution. The Constitution, being self-executing (City of Pond Creek v. Haskell, supra), provides the procedure for county seat elections, and, under the legislative acts supplemental thereto (section 5704, C. O. S. 1921), such elections are governed by the general election laws, where not in conflict therewith. County seat elections are not governed by primary election laws limiting the amounts of expenditures or providing for reports of expenditures. There is no general election law limiting the amount of expenditures or requiring a report of expenditures. Other cases cited from other states are nowhere in point. When the Legislature of Oklahoma sees fit to provide limitations upon the expenditures in general elections, they may be applicable to county seat elections, but no such limitations have yet been provided.

It is argued that to permit Shawnee to spend a large amount of money (this record does not show that a large amount of money, in proportion to the number of votes cast, was spent) would be to permit the city of Shawnee to buy the election. That is equally true as to any public official who has been nominated for public office in Oklahoma. It may be, and doubtless is, expedient for limitations upon campaign expenditures in general elections to be provided by the legislative body, but we know of no authority in a court to provide such limitations. See Allen v. Wildman, supra, in which it was said:

"The forfeiture of the right to hold office and the imposition of penalties upon freemen will not operate by judicial construction unless the legislative act under the facts proved to that effect reasonably leads to such conclusion."

Since there is no limitation on the amount of funds that may be expended in a general election, there is no public policy of the state limiting the amount of funds that may be expended in a county seat election governed by the general election laws.

Expenditures of funds in a county seat election, where the purpose is not authorized by the statutes, voids the votes influenced thereby, but does not void the result of the election, in the absence of a statute providing that such expenditure of funds will void the result of the election. The expenditure of funds for the payment of voters for polling the votes, postage, stenographic help, pamphlets, circulars, newspaper advertising, billboard advertising, registration of voters, precinct maps, office rent, pictures, labor, attorney fees, court costs, miscellaneous expense, and for services and expenses in working for the interest of one of the contesting cities, attendance upon farm sales and other public meetings, distribution of literature, the making of arguments in favor of the removal, hauling voters to the polls, and influencing the voters other than by bribery of the voters, does not constitute unlawful expenditures of funds in such an election.

Under the allegations of plaintiff hereinbefore quoted and the further allegations that "2,000 illegal voters were registered," that there were "registered more than 1,000 voters within the last 10 days next preceding the date of the election," that there were "registered more than 250 voters on the day of the election," that plaintiff was "deprived of the right to challenge" such voters, and that voters were intimidated, this court enjoined the removal of the county property and offices to Shawnee. There is nothing in the record to support those allegations or to warant this court in granting an injunction in this case. The temporary injunction is discharged and the prayer of the plaintiff for injunction is denied.

The record shows that this election was regularly held and legally conducted; that there was no such expenditure of funds, bribery, or fraud as to make it impracticable to determine the result; that the result of the election is determined by the recount of the ballots had in this court; that more than two-thirds of the qualified voters of Pottawatomie county voting at the election voted in favor of Shawnee, and that the Governor of the state of Oklahoma has issued a proclamation declaring Shawnee to be the county seat of Pottawatomie county, Okla.

It is therefore ordered, adjudged, and decreed by this court that the city of Shawnee be, and it is, the county seat of Pottawatomie county, Okla., and that the plaintiff pay the costs of this action.

LESTER, C. J., and HEFNER, McNEILL, and KORNEGAY, JJ., concur. RILEY, CULLISON, and SWINDALL, JJ., and KERR, Special Justice, dissent. CLARK, V. C. J., disqualified (Hon. ROBERT KERR,

of Ada, being appointed to serve as Special Justice).

---

RILEY, J. (dissenting). I cannot agree with the majority decision.

The self-executing provision of our Constitution governs the conduct of an election held for the relocation of a county seat. That provision is section 7 of art. 17, Constitution of Oklahoma:

"Any person or corporation offering money or other thing of value, either directly or indirectly, for the purpose of influencing any voter for or against any competing town in such election, shall be deemed guilty of bribery."

The terms of the constitutional provision are more extensive than the statutory inhibition against "offering, giving or accepting a bribe, a reward, a benefit, or advantage, or anything of value, present or future, directly or indirectly, **intended to influence the vote of the person to whom it is given or offered.**" Section 6214, C. O. S 1921. It will be noted that the Constitution condemns "the purpose of influencing any voter," whereas the statute condemns the purpose to "influence the vote of the person to whom it is given or offered." Under the statute all votes obtained by the giving or offering of anything of value to the electors therefor are to be rejected. City of Blackwell v. City of Newkirk, 31 Okla. 304, 121 Pac. 260, Ann. Cas. 1913E, 441, 232 U. S. 718, 58 L. Ed. 813, 34 Sup. Ct. 479.

By reason of the constitutional provision applying to county seat elections, where "any person" either directly or indirectly 'offers or gives" (certainly the greater includes the lesser) anything of value to influence "any voter" (the object here is personal and animate—not as in the statute, "the vote" moreover the object here is general, not specific as in the statute, "the vote of the person to whom it is given"), the result is bribery.

It will be noted that no penalty or punishment is provided within or elsewhere for violation of the constitutional provision. The result is that such bribery has the effect that follows from the law of the land; that effect is, and always has been from time long prior to the adoption of the Constitution, the nullification of votes so influenced.

"As a general rule an election which is materially influenced by bribery is void. * * * However, an election will not be set aside because of sporadic instances of bribery with which candidates are not connected." 20 C. J. 187.

At common law, "bribery," as defined by Bishop, is "the voluntary giving or receiving of anything of value in corrupt payment for an official act done, or to be done." State v. Meysenburg, 171 Mo. 1, 71 S. W. 229.

Now, by virtue of our Constitution, the giving of money to influence any voter for or against any competing town is bribery. In other words, the payment for the influence of a voter in such an election is bribery.

Advocates of Shawnee deny and defend and urge upon us (successfully as to the majority) that, inasmuch as those hired were "already for Shawnee," there was no changing over from one town to the other in the attitude of the citizens employed, and consequently there was no bribery.

That defense to a bare minority of us is rank sophistry. We illustrate: In the consideration of this case by this court a number of the Justices are inclined as a matter of law to be favorable to Tecumseh. These Justices may be said to be for Tecumseh. Their judgment will incline them to cast their vote for Tecumseh in this decision. They will argue much or little with their associates upon Tecumseh's side of this case. Suppose that surreptitiously the fact of their inclination was ascertained by partisans for Tecumseh and these partisans would raise a fund, offer and pay the same to the minority Justices for influence and extra exertions by way of argument and for research briefs, to be presented to some one of the bare majority of the Justices now inclined, under their liberal view, for Shawnee, so doing in hope of finally securing a quorum of votes of this court and a favorable decision. Suppose that the decision is rendered accordingly, and subsequently the recipients of the fund are called upon in a proceeding brought for that purpose to answer for bribery. They deny and defend—deny that their conduct constituted bribery and defend on the ground that, although they received the money for the exertion of their influence, they were not bribed, for they were not changed over. Query: Would such facts constitute bribery? We think so. Query: Would the votes cast by those so hired to exert their influence be legal? No court would hold affirmatively. This is an extreme analogy, it is true, and not likely to happen, but it is within the principle, and being so it tests the correctness of the rule—it presents it naked and undisguised, free from those softening circumstances which in less strong

cases veil its innate deformity, but that at sometime or other, on proper occasion, would produce the most baneful effects on society.

Those softening circumstances about which we speak were long ago considered by this court in a county seat election case wherein it was held that the citizens there received the money "ostensibly for their day's work, but really for their votes." Incorporated Town of Ryan v. Town of Waurika, 29 Okla. 655, 119 Pac. 220.

So, too, this court has previously considered and condemned the "paying to supposed leaders considerable sums of money for their influence and support" in an action between these same parties and upon the same subject-matter. City of Tecumseh v. City of Shawnee. 33 Okla. 494, 126 Pac. 440.

It is the view of the minority that the decision herein permits the employment of citizens of a county without limit as to the number employed and without limit as to the amount paid each for the exertion of their influence for or against a competing town in such an election. That, we think, was condemned by the highest of mandates and transmitted for our rule and guide by the most solemn of instruments, the Constitution by which we are governed.

"It is not easy to conceive," says the Canadian court (V. Can. Sup. Ct. Rep. 133), "how a much more general and effective system of corruption could be established." Employment of men—30 in number—by a partisan to guard the peace on election day was there said to be "colorable, or as a cloak for bribery and undue influence," and it was observed, "if 30 men can be so paid, why not more?" So say we, as applied to the instant case. If 140 men, admittedly hired by Shawnee to exert their influence for the one town and against the other, can be lawfully hired for influence in the election, why should not any candidate in the future, if possessed of a fat purse, simply employ the whole electorate or the required majority thereof? Or, better yet, why not auction off the office or coveted honor as spoils, as was once done in New Hampshire?

When it shall be seen that elections are to be simply the measure of the size of the candidate's purses, it will be easier for expectant, hopeful and poverty-stricken citizens to answer affirmatively such inquiries as propounded by Mr. Ingram to these 233 payees, testing whether they were already for the side upon which the inquirer was permitting the money to flow.

Thus, but for the wrongfulness of the act, two-thirds of the electorate could be hired, and when so hired, can we as judges say the merits of the issue in the campaign actuated them in casting their vote, or should we say the employment motivated them? The rule of law is, we cannot know the independent will of electors bribed.

"Those who believe in the perpetuity of government by the people must rest their hopes in the virtue of the people, and unless this vitalizing principle is unshackled in its exercise, such government cannot exist. * * *" Orr v. Kevil, 124 Ky. 720.

"It is, therefore, of highest importance that the courts should scan the conduct of elections with deep interest and jealous care and enforce with vigor the laws provided for discouraging fraud and violence." Id.

"Whenever elections are not free and equal, the democratic principle is dead, and republican form of government will exist only in name. A people may lose their liberty while retaining the name and form of democracy. The freedom of republican Rome was lost in the despotism of the empire, when, by law, it was death even to suggest a return to monarchy." Id.

In the case at bar about $9,000 of the fund in the hands of the Shawnee committee was paid to voters of Pottawatomie county geographically located in almost every precinct of the county. These voters were selected by reason of their leadership and influence. Numerically they were far in excess of the number necessary to change the result of the election. That number was seventy-four and one-third. The calculation follows:

| Tecumseh | 6,744 votes. |
| Shawnee | 13,757 votes. |
| Mutilated ballots | 23 |
| Total votes cast | 20,524 |
| 2/3 votes required for Shawnee under sec. 6, art. 17, Const. | 13,682 2/3. |

For authority of this calculation see Inc. Town of Bristow v. Sapulpa. 33 Okla. 484, 126 Pac. 446.

In Grove v. Haskell, 34 Okla. 707, 104 Pac. 56, this court cited with approval a Wisconsin case, State ex rel. Hopkins v. Olin, 23 Wis. 309:

"In our form of government, where the administration of public affairs is regulated by the will of the people, or a majority of them, expressed through the ballot box, the free exercise of the elective franchise by the qualified voters is a matter of the highest importance. The safety and perpetuity of our institutions depend upon this. It is, therefore, particularly important that every voter should be free from any pecuniary influence."

In the former case between these parties

it was held: Widespread corruption materially affecting an election, such as an offer of a courthouse and jail building for a period of ten years with only a nominal rent as an inducement to voters; an expenditure of a large sum of money without record or account, showing the portion legitimately and illegitimately expended, and actual bribing of a large number of voters in different parts of the county; the corruption of election officers so that the result of the election is inextricably in doubt and the will of the uncorrupted voters of the county cannot be ascertained—will make void such an election. City of Tecumseh v. City of Shawnee, supra.

I conclude, therefore, that the wrongful use or offer of money to influence voters for or against a county seat contestant, when "so extensive and general throughout the county that it is impracticable, if not impossible, to ascertain the extent thereof, will invalidate such an election.

The purpose of the constitutional restriction was to make such county seat elections a spontaneous expression on the part of voters, whereas by statute no such purpose exists. Section 6119, C. O. S. 1921, et seq., provides the amount of money that can be expended by certain candidates for party nominations. Thereby it is contemplated that in such elections money to a limited amount may be properly expended. Such provisions for primary elections have nothing to do with county seat elections, but by contrast show the purpose of the constitutional provision, which exists to prevent determination of the location of a county seat based upon monetary consideration flowing to the electorate participating.

When the constitutional provision heretofore quoted was adopted, no doubt the framers of the instrument had in mind just such a situation as here appears, otherwise they would not have declared the doing of certain things bribery which in the absence of such a provision would not constitute that offense. Grove v. Haskell, supra.

My view is that the accounting in this case at bar is no better than it was in the former case between Shawnee and Tecumseh, in this, that, for example, payment in such amounts as $25 or $150 in currency to a voter, noted only on a pocket memo, without mention as to date or for what purpose, is in my estimate not much of an accounting. After all, an accounting of a wrongful act does not purge it.

The record establishes the following facts which I set forth as examples of the situation before us:

Approximately 195 names of voters who received money are contained upon a list introduced as exhibit No. 1. Exhibit No. 5 contains another such list. Testimony shows others received payments from the fund.

Mr. Ingram testified that all these persons whose names are shown by exhibit No. 1 were employed and paid "to work for Shawnee and to try to influence voters in its behalf" (R. 19). But he testified further: "Every man I paid any money to told me before I talked to him on the point —I pinned him down on that question—if he was for Shawnee, and they all told me they were, and this—any that was not, I did not hire them." (R. 31.)

Hereinafter is set out some of the testimony in narrative form for the purpose of showing the exact circumstances under which payments were made.

Mr. Scarbrough testified (R. 84) he lived at Tribbey, worked for Shawnee, received $50 from Mr. Ingram for that purpose. He was for Shawnee anyway, spent $20 to hire a car for Shawnee, bought groceries out of the other $30.

Mr. Atchley testified (R. 311) that he lived three miles west of Wanette, lived there seven years, had lived around Wanette 21 years, worked for Shawnee, made arrangements with Mr. Hawk and Mr. Ingram. "A. Well, I offered them my services if they would pay my expenses. They paid me $120. I expect I worked about 15 or 18 days and then longer in piece days. Was paid $5 a day to poll and find out how the people felt about the election. Q. And you were also to use your influence in any way you could reasonably to get votes for Shawnee. That is right, isn't it? A. Yes, sir; if they wanted to, that is right, yes. Q. Well, you talked to persons and you argued Shawnee's case to them, didn't you? A. I think so."

Green Perkins testified (R. 327) he lived at Asher, talked for Shawnee, made arrangements with Mr. Hawk of the committee. "I told him I thought possibly by some of us working we could change a few votes. They gave me $25 to work until the election, from September 8th to December 17th. I talked to people I thought was doubtful." Electioneered with them for Shawnee, tried to persuade them to vote for Shawnee. Got the money from Joe Ingram. Was always for Shawnee.

Mr. Hawk testified (R. 117): Identified

exhibit 5 as containing disbursements made by him for Shawnee. He paid out in cash $580.50 to workers for Shawnee; paid King and Trokey $30 to work in Romulus and Moore townships under these arrangements: "Well, go into a community and work for the interest of the campaign which we had on and if necessary hire a man with his car, and hire a man to go out and investigate the individuals and see whether they were for Shawnee or Tecumseh," and to haul voters to the polls. Paid Willis $10. (R. 122); "wanted Mr. Willis to come in so we could check out"; sent him to Burnett township to check the precincts electioneering—he lived there.

Tom C. Waldrep (R. 127) disbursed funds in cash to 15 or 20 people, and received $2,-600 from the fund— retained $1,000 as attorney fee—disbursed $1,600 to 15 or 20 people to work for Shawnee, to electioneer for Shawnee. Spent $700 or $800 to redistrict the county, which he testified is a duty imposed upon the county.

M. O. Banks (R. 142) lived southwest of Tecumseh, worked for Shawnee, made arrangements with Mr. Hawks, received $50, $55. "I was just working, of course, seeing that different parties." "I worked at polls and saw voters there." "Just using my influence as far as I could." Was for Shawnee all of the time.

J. M. Strapp (R. 162) lived nine miles west of Tecumseh, voted in Brenton No. 1, for Shawnee, made arrangements with Ingram and Hawks, received $25 to work for Shawnee—electioneering—got $50 in all.

O. P. Ellis (R. 182) lives at Shawnee, disbursed $1,250 of the fund, hired people to poll districts and to drive cars. "Q. Did you file any statement of who you expended the money to? A. No, sir." But kept notebook.

J. W. Shoemaker (R. 193): R. J. Shoemaker is his brother, Henry Shoemaker is his son, "Me and my brother together received $75 from Mr. Ingram." Worked for Shawnee, used the money for his own purposes—used some of it driving his car around distributing bills.

R. J. Shoemaker got $75, with his brother, used part of it for Shawnee and "part for what I needed."

Grant Ratford lived at Asher (R. 212), voted for Shawnee, worked for Shawnee— received $10. The committee paid it—drove a car.

A. F. Kappas (R. 274) lived 20 miles southwest of Shawnee—got $10 from Shawnee through Mr. Hawks "to go around and see what people thought of it," to work for Shawnee; "what I didn't spend on the car I have still got." Voted for Shawnee.

On p. 14 of defendant's brief appears the following:

"We challenge the record to show that a single voter voted for Shawnee or Tecumseh, by reason of any improper or undue influence, or the unlawful or illegal expenditure of a single dime, or through the influence of any improper motive, or by the use of whisky or other intoxicating liquors."

One of the attorneys whose name appears on the brief wherein the challenge is made is shown by the record to have paid a voter $50 in check as a refund of attorney's fee to go home and get out of the campaign, when before payment the voter was "in sympathy with Tecumseh." That voter voted in Bales township. The voter testifying as to the attorney: "He writ a check for $50." "There was nothing said about me working for Shawnee; no, sir." "There was something said about getting out of the campaign and not working for Tecumseh."

The law provides:

"Bribery of a voter has been defined to be the offering or giving to him of a valuable consideration, either for his vote, or for his forebearance to vote at all." 20 C. J. 187,

The challenger is an attorney capable of drawing the proper conclusion based upon this record.

A typical example of the testimony of voters who received money is as follows (R. 69): Eliza Evans: Lives at Shawnee, was at Maud on day of election, chief of police there, received $150 from Mr. Waldrep to use his influence at Maud for Shawnee. Didn't do much of anything. Prior to the time such arrangements were made with Mr. Waldrep the witness hadn't made up his mind who he was for in the election and doesn't remember which town he voted for at the election. Cross-examination: "Q. This did not have anything to do with your vote or your action in the election, did it? A. It didn't change my vote any."

Bert B. Harmon testified that he lived five miles southwest of Tribbey. Mr. Ingram paid him $25 three or four days before the election at Shawnee headquarters. "Q. Who were you for in the county seat election when the fight first started? A. Well, really at first a little bit in sympathy with Tecumseh, but then I never did declare myself for Tecumseh. Q. Who did you vote for

144

when you voted there that day? A. I voted for Shawnee." On the day of the election this witness drove his car and hauled voters. Cross-examination: "Q. You were for Shawnee before you made the arrangement with Mr. Ingram? A. Oh, yes, yes."

Our Constitution, by section 7, art. 3, provides in part:

' "The election shall be free and equal."

A similar provision is contained in the Constitutions of California, Colorado, Delaware, Georgia, Illinois, Oregon, Pennsylvania, and in some form in nearly every other state Constitution, the principle having been brought to this country from England. (English Bill of Rights, art. 8). Atwater v. Hossett, 27 Okla. 292, 111 Pac. 802; City of Pond Creek v. Haskell, 21 Okla. 711, 97 Pac. 338.

It is essential to the very idea of election that it should be free, hence it is understood that, independent of positive provisions against bribery, whenever a return of an election is "in consequence of an undue influence acquired by that means," the election is void. "The person who gave his vote under such influence being to be considered as if he had not voted at all." State ex rel. Newell v. Purdy, 36 Wis. 213.

In State ex rel. Bell v. Conness (Wis.) 82 N. W. 288, one party paid through a foreman certain persons, who voted, for their loss of time in going to the polls; that court said:

"To permit such an election to stand requires us to shut our eyes to and excuse practices that ought always to receive the severest condemnation."

Justice Brewer of Kansas well said, in the county seat election case of State v. Elting, 29 Kan. 397:

"The great danger which now lies in the path of free institutions is the use of money in elections, the scope of this healthful doctrine (a vote in consideration of money or value given to a third party is void) should in no manner be limited or abridged by the courts."

And it was further said therein by that eminent jurist:

"When a candidate gives an elector personally money or property, there is a direct attempt to influence his vote by pecuniary considerations. The expectation is that such vote will be controlled, not by the elector's judgment of the fitness of the candidate for the office, but by the pecuniary benefit he has received. In other words, it is money and not judgment which directs the ballot; and so the election turns not on considerations of fitness or public good, but of private gain. Let such be tolerated, and elections will be governed simply by the measure of the size of the candidate's purses. * * * That which is wrong when done directly, is equally wrong when done indirectly."

In the case of Honaker v. Board of Education, 42 W. Va. 170, 32 L. R. A. 413, where a member of a school board received compensation for attending a meeting from a person who was interested in action taken at the meeting, but under strict admonition that the money paid was not to influence the member's vote, but merely to compensate such member for loss of time at the member's store, it was held that the payment amounted to unlawful influence, having the effect of bribery, so as to annul action taken by the aid of such member.

It is a matter of common knowledge that democracies act in groups, under the inspiration and direction of leaders. From the dawn of history it is apparent that such is the case, and probabilities are that the future will continue the fact. Political ideas may germinate in the hearts and minds of those composing the great masses, but they come to fruition when leaders give them concrete form. Democracy advances by a process of accretion, but occasionally great leaders arise, having a mystical insight into the purposes, hopes, and aspirations of the people, such as Jefferson or Lincoln, and democracy goes forward by great leaps and bounds, supported by the franchises of a free people. Are we to say an election is free when the leaders are hired for their exertion and expression which motivate the electorate? Or. indeed, are these leaders themselves free when hired and paid to influence others? We think not. State of Wis. ex rel. LaFollette v. Kohler, 69 A. L. R. 348. To influence leaders by the use of money to work for Shawnee is within the constitutional inhibition and just as much to be condemned as the outright purchase of such a leader's vote.

The principle being that such a guardian of the public welfare can not serve two masters at the same time, I conclude, therefore, that under the evidence the campaign committee of Shawnee violated the provisions of section 7, art. 17, Constitution of Oklahoma, by giving money for the purpose of influencing voters of Pottawatomie county for Shawnee and against Tecumseh in said election to the extent that their acts and conduct amounted to unlawful influence and had the effect of bribery; that the use of funds as shown by the evidence did corrupt the electorate to the extent that said election should be held void.

CULLISON and SWINDALL, JJ., and KERR, Special Justice, concur.